**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ALBERT PURCELL SHOEMAKER                    CIVIL ACTION

VERSUS                                                          NO. 14-163

ESTIS WELL SERVICES, L.L.C.                    SECTION: "G"(1)

## ORDER

In this action, Plaintiff Marilyn Shoemaker ("Plaintiff"), suing as curatrix on behalf of her son and interdict Albert Purcell Shoemaker ("Shoemaker"), seeks compensation for injuries suffered by Shoemaker aboard an inland drill barge owned and operated by Defendant Estis Well Service, LLC ("Estis"). Pending before the Court is "Plaintiff's Motion Under Rule 60 for Relief from an Order of Dismissal and to Set Aside a Compromise."[1] Having considered the  motion, the memoranda in support, the memorandum in opposition, the parties' evidence, and the applicable law, the Court will deny the pending motion.

## I. Background

### A. Factual Background

In her complaint, Plaintiff contends that Shoemaker was injured on September 28, 2011 while he was employed as a seaman aboard an inland drill barge operated by Estis.[2] Plaintiff alleges that while Shoemaker was "attempting to perform assigned chores" aboard Estis's vessel, he suffered "severe and permanently disabling burn injuries" to numerous parts of his body, plus brain, bone, muscle, tissue, and nerve injuries.[3]  Plaintiff asserts that these injuries resulted from Estis's negligence and from the unseaworthiness of the inland drill barge on which Shoemaker was

---

[1] Rec. Doc. 51.

[2] Rec. Doc. 1 at 1.

[3] *Id.*

working.[4] She maintains that Shoemaker's injuries have "greatly impaired his wage earning capacity," entitling him to damages.[5]

## B.  Procedural Background

This is the second time that claims arising from Shoemaker's September 28, 2011 accident have been before this Court. Shoemaker himself filed an action in this Court against Estis on October 12, 2011, making essentially identical allegations to those present here.[6] Shoemaker and Estis settled that action on March 8, 2012,[7] and this Court dismissed the case on May 16, 2012.[8]

On November 5, 2013, Plaintiff filed a Petition for Interdiction against Shoemaker in the 21st Judicial District Court in Tangipahoa Parish.[9] The 21st Judicial District Court granted the Petition for Interdiction on December 10, 2013, decreeing that Shoemaker was "incapable of taking care of his person and administering his affairs" and appointing Plaintiff as his curatrix.[10]

In her capacity as curatrix of Shoemaker, Plaintiff filed the present action against Estis in this Court on January 21, 2014.[11] Estis filed an Answer on February 13, 2014.[12] On February 18, 2014, Plaintiff filed a "Motion for Declaratory Judgment."[13] The Court denied Plaintiff's "Motion for

---

[4] *Id.* at 1–2.

[5] *Id.* at 2.

[6] *Compare Shoemaker v. Estis Well Serv., LLC*, No. 11-2562, Rec. Doc. 1 *with Shoemaker v. Estis Well Serv., LLC.*, No. 14-163, Rec. Doc. 1.

[7] No. 11-2562, Rec. Doc. 47.

[8] No. 11-2562, Rec. Doc. 50.

[9] *See* Rec. Doc. 11-1 at 1.

[10] *See Id.* at p. 8.

[11] Rec. Doc. 1.

[12] Rec. Doc. 4.

[13] Rec. Doc. 8.

Declaratory Judgment" on August 19, 2014, reasoning that a party must file an action for a declaratory judgment, and cannot obtain one by filing a motion.[14]

On March 6, 2014, Estis filed a "Motion to Dismiss and Alternatively for Summary Judgment Due to *Res Judicata*."[15] The Court denied Estis's "Motion to Dismiss and Alternatively for Summary Judgment Due to *Res Judicata*" on December 9, 2014.[16]  In its Order denying that motion, the Court concluded that Estis had not carried its burden of showing that no genuine issue of material fact existed regarding whether Shoemaker's claims were barred by *res judicata* because Plaintiff had called into question the validity of the settlement agreement upon which the prior judgment was based, and so the Court denied the motion.[17]

 Specifically, the Court first observed that "[w]hen a seaman plaintiff challenges the validity of a settlement agreement in a post-judgment motion . . . the district court  'must hold a hearing on the disputed issues of the validity and scope of the agreement.'"[18] Noting, however, that no post-judgment motion had been filed in this case, the Court considered whether a plaintiff could attack the validity of a settlement agreement in a subsequent action, irrespective of whether a post-judgment motion had been filed.[19] On this point, the Court concluded that several decisions of the United States Court of Appeals from the Fifth Circuit "illustrate that a plaintiff may attack the validity of a settlement agreement in a subsequent action," and that "such an attack may present factual issues that

---

[14] Rec. Doc. 35 at 2.

[15] Rec. Doc. 10, 13.

[16] Rec. Doc. 42.

[17] *Id.* at 10.

[18] *Id.* (quoting *Stipelcovich v. Sand Dollar Marine, Inc.*, 805 F.2d 599, 606 (5th Cir. 2007) (citations omitted)).

[19] *Id.* at 13–16.

preclude summary judgment based upon *res judicata*."[20]  Applying these rules to the present case, the Court held that genuine issues of material fact existed regarding the validity of the settlement agreement, precluding the Court from granting summary judgment to Estis.[21]

On January 22, 2015, Plaintiff filed the instant motion.[22] Estis filed an opposition on February 13, 2015.[23] On March 11, 2015, with leave of Court, Plaintiff filed a reply in further support of the motion.[24] On May 1, 2015, the Court held an evidentiary hearing during which Plaintiff, Dr. Roberta Bell ("Dr. Bell"), Shoemaker, Jack Hoyle ("Hoyle") and Harry Morse ("Morse") testified.[25] Plaintiff's witness, Ronna Steele ("Steele"), who represented Shoemaker in the prior litigation and was terminated before Shoemaker settled his claims, was unable to appear during this hearing. Therefore, the hearing was continued to May 13, 2015, to allow Steele to testify.[26]  Following the hearing, Plaintiff filed a post-hearing brief on June 11, 2015.[27] Defendant's brief followed on June 22, 2015.[28] A summary of the hearing testimony follows.

---

[20] *Id.* at 16 (citing *Wink v. Rowan Drilling Co.,* 611 F.2d 98 (5th Cir. 1980)*, Gueho v. Diamond M Drilling Co.,* 524 F.2d 986 (5th Cir. 1975); *Gauthier v. Continental Diving Services,* 831 F.2d 559 (5th Cir. 1987)).

[21] *Id.* at 17.

[22] Rec. Doc. 51.

[23] Rec. Doc. 54.

[24] Rec. Doc. 61.

[25] Rec. Doc. 71.

[26] Rec. Docs. 75 and 76.

[27] Rec. Doc. 78.

[28] Rec. Doc. 79.

*C. Testimony Adduced at the May 1, 2015 and May 13, 2015 Hearings*

### 1. Testimony of Plaintiff Marilyn Shoemaker

Plaintiff testified that Albert Shoemaker is her son.[29] Following the September 2011 accident, Plaintiff visited Shoemaker at the hospital.[30] Shoemaker was conscious, but at times he acted like he did not recognize Plaintiff.[31] Shoemaker hired an attorney while he was in the hospital.[32]

Following his release from the hospital, Shoemaker went to live with Plaintiff.[33] Plaintiff testified that Shoemaker would get upset and act "out of control."[34] She stated that she "couldn't control [Shoemaker] because . . . he would get violent."[35] According to Plaintiff, she was unable to stop Shoemaker from firing his attorney.[36] After firing his first attorney, Shoemaker hired Steele.[37] Plaintiff testified that she and Shoemaker moved into a house provided by Steele.[38] Plaintiff testified that Shoemaker could not take care of himself, but she did not have him interdicted at that time because "[t]ough love is hard."[39] Plaintiff stated that Shoemaker applied for Social Security disability benefits, which were denied because he was found to be malingering.[40]

---

[29] Transcript at 22.

[30] *Id.* at 22–23.

[31] *Id.* at 23.

[32] *Id.* at 63.

[33] *Id.* at 25.

[34] *Id.*

[35] *Id.* at 26.

[36] *Id.* at 34.

[37] *Id.* at 70.

[38] *Id.* at 71–72.

[39] *Id.* at 73.

[40] *Id.* at 74.

Plaintiff testified that when Shoemaker began talking about wanting to settle his case she told him to let his attorney, Steele, handle it.[41] Plaintiff and Shoemaker later called Hoyle, who was Estis's claims adjuster, to let him know that Shoemaker wanted to settle his case.[42] Hoyle told them that Shoemaker would have to fire Steele before he could speak to them.[43] Plaintiff testified that she did not ask Hoyle to help her get Shoemaker mental health treatment because Shoemaker "was sitting right there" and she had to be careful not to upset him.[44] Plaintiff stated that Steele was trying to get Shoemaker mental health treatment.[45]

Plaintiff testified that Shoemaker fired Steele the morning of his scheduled deposition.[46] The deposition never occurred.[47] Hoyle met Plaintiff and Shoemaker at their home later that day, and they made an agreement to settle Shoemaker's case.[48] Plaintiff testified that she told Hoyle that she believed Shoemaker had a head injury and needed medical attention.[49] According to Plaintiff, Hoyle told Shoemaker not to tell the judge that he was still under a doctor's care and taking medication because then the judge may not let them "resolve" the case.[50]

---

[41] *Id.* at 37.

[42] *Id.* at 38.

[43] *Id.* at 39–40, 77.

[44] *Id.* at 77.

[45] *Id.* at 78.

[46] *Id.* at 41–42, 44.

[47] *Id.* at 46.

[48] *Id.* at 77, 87–88.

[49] *Id.* at 47.

[50] *Id.* at 48, 90.

Plaintiff attended the settlement conference with Shoemaker.[51] Shoemaker did not have an attorney representing him at that time.[52] She testified that she understood that Shoemaker was settling his case.[53] She stated that she did not speak up at the settlement conference because she had "to live with [her] son."[54] According to Plaintiff, she could not control Shoemaker.[55] She testified that Shoemaker told the judge he was not taking any medications, which was false.[56]

Plaintiff also accompanied Shoemaker to the conference where he signed the Receipt and Release.[57] Plaintiff opined that Shoemaker was incapable of answering the questions posed to him at that time because of the pain medication he was taking.[58] However, during the conference Plaintiff testified that she believed Shoemaker understood the proceedings.[59] Plaintiff was not with Shoemaker when he received the settlement check, but she testified that he returned home with the money in the form of 20-dollar bills.[60] According to Plaintiff, Shoemaker spent all of the settlement funds within a one-month period.[61] Plaintiff testified that she did not get Shoemaker mental health treatment because she could not afford it.[62]

---

[51] *Id.* at 52.

[52] *Id.* at 56.

[53] *Id.* at 53.

[54] *Id.* at 53, 82.

[55] *Id.* at 54.

[56] *Id.* at 55.

[57] *Id.* at 55–56.

[58] *Id.* at 93.

[59] *Id.* at 91.

[60] *Id.* at 69.

[61] *Id.* at 101.

[62] *Id.* at 107.

According to Plaintiff, Shoemaker does not control his own affairs or his money.[63] Plaintiff has called the police to report Shoemaker's violent outbursts, and she had him placed in a treatment center for threatening to hurt her.[64] Plaintiff acknowledged that prior to his accident in 2011, Shoemaker was convicted of theft-by-fraud and was arrested for DWIs.[65]

Plaintiff stated that she believed Shoemaker was taken advantage of in settling his case "from the get-go."[66] Immediately following the settlement, Plaintiff felt that it never should have occurred.[67] Following the settlement, Plaintiff testified that she called Steele's office to ask her to continue working on the case because she believed Shoemaker needed medical treatment.[68]

### 2. Testimony of Dr. Roberta Bell

Dr. Bell is a neuropsychologist and clinical psychologist who has been licensed since 1987.[69] The Court accepted her testimony as an expert in neuropsychology and clinical psychology.[70] She performed a neuropsychological evaluation of Shoemaker on September 3, 2013.[71] She testified that Shoemaker "performed within the mildly mentally handicapped or mentally retarded range . . . demonstrating very significant intellectual difficulties," with an IQ of 65.[72] Dr. Bell did not have prior

---

[63] *Id.* at 58.

[64] *Id.* at 59–60.

[65] *Id.* at 65–67.

[66] *Id.* at 108.

[67] *Id.*

[68] *Id.* at 111–12.

[69] *Id.* at 115–16.

[70] *Id.* at 118.

[71] *Id.* at 118–19.

[72] *Id.* at 124, 128.

test results to compare to the results she obtained on September 3, 2013.[73] She testified that Shoemaker also had very significant deficits in memory, scoring worse than 99 out of 100 people in his age group in both visual and auditory memory.[74]  According to Dr. Bell, Shoemaker also had problems with visual motor integration, reasoning, problem solving, shifting from one idea to another efficiently and scanning the environment.[75] Dr. Bell testified that Shoemaker had severe depression, moderate anxiety, hallucinations and delusions.[76] Shoemaker reported a suicide attempt by motor vehicle in the year following the settlement of his case.[77] Dr. Bell did not know if Shoemaker sustained a head injury during the suicide attempt, but she opined that it was "very possible" that he could have sustained a head injury, which could explain a decline in his cognitive skills prior to her evaluation of him.[78]

Dr. Bell reviewed a list of medications that Shoemaker was reportedly taking at the time of the settlement conference.[79] She noted that Shoemaker was reportedly taking several different opiate medications, which can cause somnolence or sleepiness, "decreased centration," decreased reasoning and slowed processing.[80] She also noted that Shoemaker was reportedly taking Valium, Lunesta and benzodiazapine, which impact memory.[81] According to Dr. Bell, Shoemaker was reportedly taking

---

[73] *Id.*

[74] *Id.* at 126–27.

[75] *Id.* at 127.

[76] *Id.*

[77] *Id.* at 118, 147.

[78] *Id.* at 147.

[79] *Id.* at 133–34.

[80] *Id.* at 134–35.

[81] *Id.* at 135.

Seroquel, an antipsychotic, Voltaren, an anti-inflammatory, and Robaxin, a muscle relaxer.[82] Dr. Bell testified that she does not prescribe medications.[83] Her testimony regarding the effects of medications was based on her reading of articles regarding the neuropsychological effects of certain medications.[84]

At the time of her evaluation of Shoemaker, Dr. Bell opined that he "was not mentally competent to make good decisions."[85] She testified that Shoemaker would have difficulty making financial decisions due to his mathematic skills being at a fifth grade level and his difficulty concentrating.[86] She opined that she would expect an injury "to improve initially at a rapid pace and then plateau."[87] She testified that she would not expect Shoemaker's mental condition to continue to deteriorate following the settlement and her evaluation of him.[88]

Dr. Bell noted that Shoemaker was diagnosed with a concussion following his September 2011 work accident, but an MRI revealed no brain damage.[89] She noted that alcohol abuse can affect an individual's cognitive skills.[90]

---

[82] *Id.*

[83] *Id.* at 141–42.

[84] *Id.* at 144–45

[85] *Id.* at 146.

[86] *Id.* at 137–38.

[87] *Id.* at 138.

[88] *Id.*

[89] *Id.* at 145.

[90] *Id.* at 146–47.

### 3. Testimony of Albert Shoemaker

Shoemaker testified that he remembered going to court following his September 2011 work injury.[91] He could not recall speaking to the judge, but he remembered speaking to Hoyle regarding the settlement.[92] He testified that Hoyle told him not to tell the judge that he was taking medication.[93] He could not recall any other details regarding the settlement.[94] Shoemaker denied ever smoking marijuana, but he admitted to drinking six beers a day.[95] He stated that it had "been a while" since he took any medication.[96]

Shoemaker could not recall what he bought with the settlement money.[97] He testified that someone from Estis offered to settle his case on the day of his injury for $40,000.[98] Shoemaker stated that Hoyle contacted him about settling his case.[99]

### 4. Testimony of Jack Hoyle

Hoyle testified that he provides "maritime claims consulting services to maritime employers and maritime underwriters."[100] Estis hired him to work on a claim involving Shoemaker on the date of the accident.[101]

---

[91] *Id.* at 152.

[92] *Id.*

[93] *Id.* at 153.

[94] *Id.* at 153–54.

[95] *Id.* at 154.

[96] *Id.* at 155.

[97] *Id.* at 156.

[98] *Id.* at 159.

[99] *Id.* at 165–66.

[100] *Id.* at 171.

[101] *Id.*

According to Hoyle, Plaintiff called him at some point in January 2012.[102] Hoyle returned her call on January 12, 2012.[103] He recorded the phone call because Plaintiff had indicated that Shoemaker was interested in settling his claims.[104] Hoyle advised Plaintiff that he was not allowed to discuss or negotiate a settlement with either Plaintiff or Shoemaker while they were represented by counsel.[105] Hoyle testified that he is not allowed to contact a plaintiff who is represented by counsel.[106] He suggested that Plaintiff contact Steele about settling the case.[107] Hoyle stated that he contacted Steele to inform her that Plaintiff and Shoemaker wanted to negotiate a settlement directly with Estis.[108]

On February 16, 2012, Hoyle went to Shoemaker's home to discuss settlement.[109] Hoyle testified that Steele arrived at Shoemaker's home with three uniformed policemen.[110] Hoyle left the home after Steele arrived, and he did not return until after she left.[111] When Hoyle returned, he and Shoemaker reached an agreement to settle Shoemaker's claims.[112] Plaintiff was present during these negotiations, and Hoyle testified that "[e]veryone in the room was highly motivated to resolve this

---

[102] *Id.* at 172.

[103] *Id.*

[104] *Id.*

[105] *Id.* at 173, 188.

[106] *Id.* at 187.

[107] *Id.* at 175.

[108] *Id.* at 175–76, 189.

[109] *Id.* at 175, 177.

[110] *Id.* at 178.

[111] *Id.* at 179. In a status conference after the initial day of the hearing, the parties informed the Court that Ronna Steele was at the home with the sheriff to evict the Shoemakers because she had been fired.

[112] *Id.*

claim including Mr. Shoemaker."[113]

Hoyle was present at the settlement conference before Magistrate Judge Knowles on March 8, 2012.[114] Hoyle denied telling Shoemaker to tell the Magistrate Judge that he was not taking medication.[115]

Hoyle stated that he retained Morse, an attorney, to explain Shoemaker's rights to him.[116] Both Shoemaker and Plaintiff were present when Morse explained the settlement.[117] Hoyle testified that Morse gave Shoemaker the settlement check.[118] Hoyle did not accompany Shoemaker to the bank to cash the check.[119] According to Hoyle, Plaintiff and Shoemaker did not contact him after the settlement was consummated.[120] Hoyle testified that he never observed Shoemaker acting in a way that would cause him to question his competence.[121] Hoyle stated that Steele never advised him that she believed Shoemaker had a brain injury.[122] He believed that Shoemaker's settlement was fair and equitable.[123]

### 5. Testimony of Harry Morse

Morse testified that he is an attorney retained by Hoyle and Estis to put Shoemaker's "release

---

[113] *Id.*

[114] *Id.* at 181. Magistrate Judge Shushan was originally assigned to the case. Magistrate Judge Knowles conducted the settlement conference because Magistrate Judge Shushan was not available.

[115] *Id.*

[116] *Id.* at 183.

[117] *Id.*

[118] *Id.* at  184.

[119] *Id.*

[120] *Id.* at 185.

[121] *Id.*

[122] *Id.* at 192.

[123] *Id.* at 193.

on the record."[124] According to Morse, Shoemaker did not hesitate in responses to questions or exhibit any unusual behavior during the conference.[125] Morse testified that Plaintiff was also present during the conference.[126] During the conference, Morse advised Shoemaker that he could hire an attorney to explain his rights.[127]

According to Morse, Shoemaker represented that he had not consumed alcohol or taken any medication that would affect his judgment in the 24 hours preceding the conference.[128] Plaintiff also represented that she believed Shoemaker understood the release.[129] During the conference, Shoemaker indicated that he was not experiencing any pain and was ready to go back to work.[130] Morse also explained to Shoemaker that he was not entitled to continued employment with Estis but he was welcome to reapply.[131]

### 6. Testimony of Ronna Steele

Steele testified that she represented Shoemaker for a few months.[132] According to Steele, Shoemaker terminated her representation on the date of his scheduled deposition because he refused to be deposed.[133] Steele stated that Shoemaker never told her why he did not want to be deposed.[134]

---

[124] *Id.* at 199, 209.

[125] *Id.* at 200.

[126] *Id.* at 201.

[127] *Id.*

[128] *Id.* at 202.

[129] *Id.* at 203–04.

[130] *Id.* at 204–05.

[131] *Id.* at 206, 211–12.

[132] *Id.* at 223.

[133] *Id.* at 223–26.

[134] *Id.* at 243.

Steele testified that she sent a letter to Magistrate Judge Shushan regarding Shoemaker's case because she believed that Shoemaker "may have settled his case for less than it was worth."[135] The letter stated: "Mr. Shoemaker, as a seaman, is a ward of the court and has exhibited behavior which calls into question both his understanding and capacity."[136] Steele testified that she was referencing the fact that Shoemaker is not well educated and was choosing to settle his case without representation.[137] She did not believe there was anything more the Court or she could do to prevent Shoemaker from entering the settlement agreement.[138]

Steele attended the March 8, 2012 settlement conference because she had filed an intervention claim to recover her attorney's fees.[139] According to Steele, the Magistrate Judge interviewed both Shoemaker and Plaintiff.[140]

Steele testified that Plaintiff was with Shoemaker during almost all of their meetings.[141] Steele could not recall Plaintiff ever telling her that she was concerned that Shoemaker was confused.[142] Steele testified that Plaintiff and Shoemaker were a "united front" on the issue of settling the case.[143]

---

[135] *Id.* at 226, 228.

[136] *Id.* at 230.

[137] *Id.*

[138] *Id.* at 244.

[139] *Id.* at 231.

[140] *Id.* at 232.

[141] *Id.* at 238–39.

[142] *Id.* at 242.

[143] *Id.* at 223.

## II. Parties' Arguments

### A.   *Plaintiff's "Rule 60 Motion for Relief from an Order of Dismissal and to Set Aside a Compromise"*[144]

In the instant motion, Plaintiff argues that Shoemaker "showed erratic behavior in hiring and firing several attorneys" during his first case, and that he did not understand the settlement agreement he entered into "due to his head injury, reliance on narcotic pain medication, and his injuries."[145] Plaintiff further contends that the amount of consideration he received for the settlement "is woefully inadequate to compensate him for the damages he sustained[,] which are serious, debilitating, life threatening, and permanent."[146]

In a memorandum in support of the instant motion, Plaintiff relies on 46 U.S.C. §10313(e), which provides: "Notwithstanding a release signed by a seaman under section 10312 of this title, a court having jurisdiction may set aside, for good cause shown, the release and take action that justice requires."[147] She asserts that a seaman's settlement or release is to be carefully scrutinized.[148] Plaintiff points to several factors relevant to the Court's inquiry on this point: (1) "the nature of the legal advice available to the seaman at the time of signing the release;" (2) "the adequacy of the consideration;" (3) "whether the parties negotiated at arm's length and in good faith;" and (4) "whether there was the appearance of fraud or coercion."[149] She additionally contends that Louisiana

---

[144] Rec. Doc. 51.

[145] *Id.* at 1–2.

[146] *Id.* at 2.

[147] Rec. Doc. 51-1 at 1.

[148] *Id.* at 2 (citing *Wink v. Rowan Drilling Co.*, 611F.2d 98, 100 (5th Cir. 1980)).

[149] *Id.* (citing *Simpson v. Lykes Bros. Inc.*, 22 f.3d 601, 602 (5th Cir. 1994)).

courts, citing federal decisions on point, have considered "the nature of the medical and legal advice available to the seaman at the time of signing the release."[150] Plaintiff does not explain how these factors apply to the facts presented here. Plaintiff argues that Estis bears the burden of proving the validity of the settlement.[151]

**B.    *Estis's Opposition***

Estis asserts that during the settlement conference, Shoemaker "testified [under oath] directly to Magistrate Judge Knowles that he understood the terms and effect of the settlement and that he was not impaired."[152] It contends that Plaintiff also participated in the settlement conference, and "[i]f the truth is as [Plaintiff] now alleges, she participated in a fraud on the Court to obtain payment of $115,000.00 from Estis."[153] Estis also asserts that the Receipt, Release and Indemnity Agreement was explained to Shoemaker by Estis's attorney while Plaintiff was present.[154] "Estis avers that it is unlikely that [Plaintiff and Shoemaker] lied and perjured themselves in 2012."[155] Instead, Estis asserts that "the more likely conclusion is that [Plaintiff] is attempting to perpetrate a fraud at this time.[156]

---

[150] *Id.* at 3.

[151] *Id.* at 3–4 (citing *Halliburton v. Ocean Drilling & Exploration Co.*, 620 F.2d 444 (5th Cir. 1980); *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942); *Castillo v. Spiliada Mar. Corp.*, 937 F.2d 240 (5th Cir. 1991)).

[152] Rec. Doc. 54 at 7.

[153] *Id.*

[154] *Id.* at 13.

[155] *Id.* at 15.

[156] *Id.*

### 1.    Timeliness

First, Estis contends that the present motion is untimely.[157] It asserts that Plaintiff is attempting to set aside the settlement due to alleged "misconduct or fraud," and due to "mistake as to the terms of the settlement or alleged information about Shoemaker's mental state discovered after the judgment."[158] According to Estis, these allegations fall within the grounds for relief set forth in Rule 60(b)(3), and are therefore untimely under the one-year time limit established by Rule 60(c)(1).[159]

Estis further argues that even if Plaintiff's motion is construed pursuant to Rule 60(b)(6), under which a motion may be filed "within a reasonable time" after the entry of the judgment or order at issue, she has offered "absolutely no justification" for filing the present motion nearly three years after the prior action was dismissed.[160] Indeed, Estis argues, Plaintiff was present with Shoemaker during the negotiation, settlement, and related judicial proceedings in the prior action, and would have been aware of any impairment affecting Shoemaker at that time.[161] According to Estis, Plaintiff and Shoemaker both testified under oath that Shoemaker "fully understood the terms and effect of the settlement agreement."[162] Estis contends that if Plaintiff was aware that Shoemaker was impaired during this time, she "should have brought this to the attention of Magistrate [Judge] Knowles

---

[157] *Id.* at 16.

[158] *Id.*

[159] *Id.* at 16–17 (citing *Lyles v. Seacor Marine, Inc.*, 2014 U.S. App. LEXIS 3025 (5th Cir. 2014); *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869 (5th Cir. 1989)).

[160] *Id.* at 17–18.

[161] *Id.* at 18.

[162] *Id.*

immediately during the settlement conference or to the attention of the Court immediately thereafter."[163]

### 2.      Entitlement to Relief Under Rule 60(b)(6)

Estis next argues that a motion pursuant to Rule 60(b)(6) "will be granted only if extraordinary circumstances are present."[164] According to Estis, relief under Rule 60(b)(6) is not warranted "where the parties to a settlement agreement have concealed the facts and circumstances to obtain the settlement," and "raise the concealed conditions years later to obtain relief."[165]

Estis contends that the evidence shows that Shoemaker "was completely competent and fully understood the nature and effect of the settlement agreement" at the time it was completed.[166] Estis avers that Plaintiff knew Shoemaker's "state of mind better than anyone," and repeatedly "certified that Albert was competent at the time of the settlement."[167] Further, Estis contends, Shoemaker demonstrated his competence.[168] In support of these assertions, Estis points to the transcripts of the settlement proceedings before Magistrate Judge Knowles and of the conference at which the parties completed the settlement agreement.[169] These proceedings, Estis contends, were "sufficient to satisfy

---

[163] *Id.* at 19.

[164] *Id.* at 20 (citing *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002)).

[165] *Id.*

[166] *Id.*

[167] *Id.* at 21.

[168] *Id.*

[169] *Id.*

a United States Magistrate Judge and several members of the Bar of this Court that he was making a knowing, informed and competent decision."[170]

Estis notes that Plaintiff "has not filed or referenced any evidence in connection with her rule 60 motion."[171] Nonetheless, Estis acknowledges that Plaintiff previously filed into the record a neuropsychiatric report dated September 13, 2013.[172] Estis contends that this report does not opine on Shoemaker's competency during the settlement of the prior action, which occurred more than a year before the report was prepared.[173] According to Estis, "[t]here has never been any evidence filed in this proceeding which even remotely proves that Shoemaker was anything other than fully aware and informed at the time he settled his claim."[174] Estis contends that the alleged interdiction proceedings do not suggest otherwise, because Louisiana law "presumes that all acts executed by a person during a time when they possess full legal capacity are valid and enforceable."[175] Therefore, Estis argues, none of Plaintiff's evidence calls into question its own "significant evidence" that Shoemaker was competent at the time the prior action was settled.[176]

### 3.      Fraud

Finally, Estis argues that Plaintiff is "attempting to perpetrate a fraud," because she repeatedly certified that Shoemaker was not impaired at the time the settlement was completed, and  now

---

[170] *Id.* at 22.

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.* (citing La. Civ. Code art. 394).

[176] *Id.* at 23.

20

"asserts that all of the certifications were false," in order to "get more money than what she agreed was a valid settlement three years ago."[177] Estis maintains that Plaintiff's current assertions regarding the settlement of the prior action are "irreconcilable with the record of events on March 8, 2012."[178] Thus, Estis contends, "[e]ither Plaintiff engaged in fraudulent acts on March 8, 2012 to get Estis to pay the settlement money, or she is engaged in fraudulent acts now to try to get more money."[179]

## C.    *Plaintiff's Reply*

In further support of the instant motion, Plaintiff again summarizes the law governing the validity of seaman's settlements and releases.[180] Plaintiff asserts that the motion is timely pursuant to Rule 60(b)(6) because it was filed within a "reasonable time."[181] Plaintiff also reavers that Shoemaker "lacked the mental capacity to fully comprehend the significance of the rights he was giving up and the numerous provisions of the agreement," and negotiated the agreement without counsel.[182] According to Plaintiff, Shoemaker "did not possess full knowledge of his legal rights at the time the release was perfected."[183]

## D.    *Plaintiff's Post-Hearing Brief*

In her post-hearing brief in further support of the instant motion, Plaintiff initially contends that the present case is analogous to *Halliburton v. Ocean Drilling & Exploration Co.*, wherein the

---

[177] *Id.* at 23–24.

[178] *Id.* at 25.

[179] *Id.*

[180] Rec. Doc. 61 at 1–5.

[181] *Id.* at 5 (citing *Wink v. Rowan Drilling Co.*, 611 F.2d 98, n.3 (5th Cir. 1980)).

[182] *Id.* at 4.

[183] *Id.*

United States Court of Appeals for the Fifth Circuit reversed a summary judgment ruling due to evidence that the plaintiff was unrepresented and taking medication at the time he settled his case.[184] Plaintiff contends that there, as here, the seaman, "stated that he was aware of what he was doing" when he signed his release.[185] Plaintiff argues that Shoemaker's traumatic brain injury and treatment with prescription medications "negates his statements at the Settlement Conference and the signing of the Release."[186] Plaintiff further points out that Shoemaker behaved erratically and fired his attorney before agreeing to settle his claims.[187] According to Plaintiff, a "remarkably small amount of time" passed between when Shoemaker fired his attorney and when, in the evening on that same day, he accepted an offer to compromise his case.[188] Further, Plaintiff maintains, Shoemaker lacked legal representation at the time he settled his case and perfected a receipt, release, and indemnity agreement.[189] Plaintiff contends that the presence of Shoemaker's family during this process is "no substitut[e] for a qualified and competent attorney," and the advice of his family "cannot be considered as validating in any way his settlement of this matter."[190]

Plaintiff also compares the present case to *Petty v. Odyssea Vessels, Inc.*, a case in which a district court in the Southern District of Texas "overturned a seaman's signed release for lack of mental capacity at the time of signing," on the basis that plaintiff was "taking several prescription

---

[184] Rec. Doc. 78 at 6–7 (citing *Halliburton v. Ocean Drilling & Exploration Co.*, 620 F.2d 444 (5th Cir. 1980)).

[185] *Id.* at 7.

[186] *Id.*

[187] *Id.* at 9.

[188] *Id.*

[189] *Id.*

[190] *Id.*

medications" when he signed the release, and his current psychiatrist indicated that "any of the seaman's prescriptions would have been sufficient to impair the seaman's mental capacity."[191] Here, Plaintiff contends, the testimony of Dr. Roberta Bell likewise indicates that the medication Shoemaker had been prescribed at the time he signed the lease "would have likely lessened his mental capacity."[192] Plaintiff also notes that Bell indicated that Shoemaker has suffered from problems with cognition, concentration, and memory, and has experienced a "probable substantial decline" in his abilities following the accident giving rise to the instant case.[193] Plaintiff argues that this testimony demonstrates that Shoemaker lacked sufficient mental capacity to compromise his claims.[194]

Plaintiff next points to the deposition testimony of Magistrate Judge Knowles.[195] Plaintiff indicates that Magistrate Judge Knowles viewed three documents in the deposition: (1) a letter from Ronna Steele, Shoemaker's former attorney, indicating her concern about Shoemaker's mental capacity; (2) records from Dr. Bradley J. Bartholomew, in which Bartholomew recommended that Shoemaker receive neuropsychiatric testing, "perhaps a 3T MRI scan," and treatment for pain management and his head injury; and (3) pharmacy records showing the medication that Shoemaker

---

[191] *Id.* at 9–10 (citing 115 F.Supp.2d 768, 771–72 (S.D. Tex. 2000)).

[192] *Id.* at 10.

[193] *Id.*

[194] *Id.* Plaintiff also argues that, consistent with Federal Rule of Civil Procedure 26, Dr. Bell included "several concrete opinions . . . regarding Shoemaker's mental condition at the time of the settlement of the case," and advised in the report and in her testimony that she "was qualified and could give an opinion as to his mental condition" on the date Shoemaker settled his claims. *Id.* at 11.

[195] *Id.* at 11.

was taking at the time he signed the release.[196] According to Plaintiff, the following colloquy then ensued:

> Question:   Judge Knowles, if you had had [sic] the benefit of the information which I called your attention to today . . . do you think that you would have been able to approve this settlement?

> Answer:   I really don't know. I can tell you that if I had had all of that information, I would have certainly questioned him closely. And I'm not sure that I didn't, but, certainly, the information would cause me to—would give me pause and would cause me to question him a lot more carefully than I would a normal personal injury plaintiff. That's about the best I can say. And if—but I would make a judgment at that point as to whether I felt like he understood it or not. That is the best I can do.[197]

Finally, Plaintiff indicates that Shoemaker received $110,000 to compromise his claim, an amount she claims is "woefully inadequate" for a claim including an element of brain damage, and does not meet the test for a "valid, fair and complete settlement."[198]

## E.   *Estis's Post-Hearing Brief*

### 1.   Timeliness

In a post-hearing brief filed in further opposition to the instant motion, Estis first reavers that the motion is untimely, because it seeks relief on the implicit basis that Estis procured the settlement by fraud or misconduct, and is therefore subject to the one-year limitations period set forth in Rule 60(c)(1).[199] Estis further reavers that even if Plaintiff's motion is construed pursuant to Rule 60(b)(6), the motion is still untimely, because Plaintiff has not adduced any evidence addressing why she did

---

[196] *Id.* at 10–11.

[197] *Id.* at 12.

[198] *Id.*

[199] Rec. Doc. 79 at 2–4.

not file the instant motion until January 22, 2015, nearly three years after Shoemaker settled with Estis.[200] Indeed, Estis contends, Plaintiff's "primary argument" on the instant motion—that Shoemaker lacked capacity to compromise his claims due to the medication he had been prescribed—rests upon facts known to Plaintiff, to Shoemaker's family and friends, and to Shoemaker's attorney at the time Shoemaker settled his claims.[201] Estis further indicates that Plaintiff testified in the evidentiary hearing that "she was unaware of any impediment to her or her son filing pleadings to void the settlement within a year from the entry of the final Order of Dismissal."[202] Therefore, Estis argues, if Plaintiff knew that Shoemaker was incompetent at the time of settlement, then "there was absolutely no reason whatsoever for her not to have filed a Rule 60 motion within the one year limitation [period]" set forth in Rule 60(c)(1).[203]

### 2.        Discussion of Evidence Adduced at the Rule 60 Hearing

Addressing testimony given at the Rule 60 hearing, Estis first indicates that, despite Shoemaker's "attempt to put on an act of incompetence," and despite his "feigned lack of memory" during the Rule 60 hearing, Shoemaker nonetheless agreed that his sworn statements made in connection with the settlement of his claims on March 8, 2012 were true.[204] Estis notes that transcripts of the proceedings on March 8, 2012 indicate that Shoemaker "answered the questions asked and how he interacted with the Court and counsel."[205] Estis maintains that Shoemaker showed "no hesitation

---

[200] *Id.* at 4–5.

[201] *Id.* at 5.

[202] *Id.*

[203] *Id.*

[204] *Id.* at 6.

[205] *Id.* at 7.

in [his] responses, no responses that could be considered inappropriate, and definitely no indication that he was incompetent or incoherent."[206] Estis further contends that Plaintiff did not adduce any evidence indicating that Shoemaker "had seen any healthcare provider for any physical complaints after March 8, 2012,"and also failed to adduce evidence suggesting that Shoemaker "had not fully recovered from his injuries," or that he "could not have returned to work,"as he had represented on March 8, 2012.[207]

Additionally, Estis notes, Shoemaker confirmed that he had discharged his attorney, Ronna Steele, on February 16, 2012, the day he was scheduled to give a court-ordered deposition in Lafayette, Louisiana.[208] Estis argues that the sequence of events beginning on February 16, 2012 and culminating with the March 8, 2012 settlement conference before Magistrate Judge Knowles "calls into question certain testimony of the Shoemakers."[209] Estis notes that Shoemaker, accompanied by Plaintiff and several other individuals, reached a tentative settlement agreement on February 16, 2012, although the actual settlement conference occurred later, on March 8, 2012.[210] Estis contends that if Plaintiff was concerned that Shoemaker was incapable of understanding the settlement, she should have sought to interdict him before the settlement conference.[211]

Estis further argues that the evidence pertaining to events between March 8, 2012 and September 3, 2013, the date on which Shoemaker was referred to Dr. Bell for evaluation, "shows a

---

[206] *Id.*

[207] *Id.* at 10.

[208] *Id.*

[209] *Id.* at 11.

[210] *Id.*

[211] *Id.* at 12.

noticeable gap.[212] According to Estis, Plaintiff "could not, or would not" describe what occurred during the intervening period of time.[213] Nonetheless, Estis argues, records show that Shoemaker applied for Social Security Disability benefits on August 1, 2013, and had retained Dr. Bell to support that claim.[214] Estis notes that Dr. Durdin in turn examined him on behalf of the Social Security Administration, and observed that he was "malingering on testing," and concluded that he was not impaired, showed no signs of cognitive decline, and could "sustain productivity over a forty hour work week," whereupon the Social Security Administration denied his claim for benefits.[215]

Estis contends that Plaintiff did not adduce any evidence showing that Shoemaker was "incompetent or in some altered state of mind" on February 16, 2012 or March 8, 2012.[216] Rather, Estis contends, Plaintiff has only suggested "through innuendo, supposition, and interpretation" that she and Shoemaker could meet privately with Magistrate Judge Knowles, and that Shoemaker "could appear before Magistrate Judge Knowles under oath, fool him, and thereafter answer questions in two separate settlement proceedings as directly and candidly as he did without anyone noticing that he was incoherent."[217] Nonetheless, Estis contends, Plaintiff "claims that she knew" that Shoemaker was incompetent "all along and just waited for over two years to bring it to the Court's attention."[218]

---

[212] *Id.*

[213] *Id.*

[214] *Id.*

[215] *Id.* at 12–13 (citing Defense Exhibit 12).

[216] *Id.* at 13.

[217] *Id.* at 14.

[218] *Id.*

Estis further contends that records of pharmaceutical prescriptions submitted by Plaintiff do not cast doubt upon Shoemaker's competency during the settlement proceeding, because "there is no evidence of the effect of the medications prescribed [or] their possible side effects."[219] Additionally, Estis argues, the medical records of Dr. Bradley Bartholomew, also submitted by Plaintiff, do not provide any support for her claim that Shoemaker was "seriously impaired at the time of the conference and was also under the influence of several prescription narcotics," because "the mere fact that a healthcare provider prescribed medication in the past is no[t] evidence" that the medication affected Shoemaker so strongly that he "did not understand what he was doing on March 8, 2012."[220]

### 3.    Adequacy of Consideration

Estis next addresses the adequacy of consideration given to Shoemaker in order to settle his claims. On this point, Estis indicates that it adduced evidence of: (1) the canceled checks made payable to Shoemaker;[221] (2) the releases executed with Shoemaker's former attorneys;[222] (3) the maintenance checks paid to Shoemaker;[223] and (4) a register of medical payments made on Shoemaker's behalf, totaling $42,068.70.[224] Estis argues that the $57,500 paid to Shoemaker's attorneys was considerably less than those attorney's would have received under their contracts with Shoemaker, and that Shoemaker and Plaintiff knew this when they terminated Ms. Steele and

---

[219] *Id.* at 14–15 (citing Plaintiff's Exhibit 2 and Plaintiff's Exhibit 4).

[220] *Id.* at 15.

[221] *Id.* (citing Defense's Ex. 1, Defense's Ex. 3).

[222] *Id.* at 15–16 (citing Defense's Ex. 7; Defense's Ex. 8).

[223] *Id.* at 16 (citing Defense's Ex. 10).

[224] *Id.* (citing Defense's Ex. 11).

28

commenced direct negotiations with Estis.[225] According to Estis, Plaintiff and Shoemaker fired Ms. Steele in order to avoid paying her 40% of the settlement amount.[226] Estis maintains that the adequacy and fairness of the settlement "is apparent," because, in total, it paid $172,500 to Shoemaker and his attorneys, and because Shoemaker "testified, under oath, that as of March 8, 2012 he had recovered from his injuries and was ready to return to work."[227]

## III.  Law and Analysis

### A. Standard on a Rule 60 Motion

The instant motion is governed by Federal Rule of Civil Procedure 60. That Rule states, in pertinent part:

> (b)　Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1)　mistake, inadvertence, surprise, or excusable neglect;
> (2)　newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3)　fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4)　the judgment is void;
> (5)　the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6)　any other reason that justifies relief.

In considering which of Rule 60(b)'s enumerated grounds for relief might apply, the Fifth Circuit instructs that "[t]he first five clauses of Rule 60(b) and the sixth are mutually exclusive."[228]

---

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] *Hess v. Cockrell*, 281 F.3d  212, 215 (5th Cir. 2002).

In other words, if relief is available on the grounds set forth in clauses (b)(1) to (b)(5), relief is not available pursuant to clause (b)(6).[229] Therefore, Rule 60(b)(6) has been described as a "residual clause used to cover unforeseen contingencies," and as "a means for accomplishing justice in exceptional circumstances."[230]

In general, Rule 60(b) is a "grand reservoir of equitable power to do justice in a particular case."[231] Rule 60(b) "attempts to strike a balance between two conflicting goals, the finality of judgments and the command of courts to do justice."[232] The Fifth Circuit has set forth the following eight factors that guide the Court's discretion on a Rule 60 motion:

> (1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) whether—if the judgment was a default or a dismissal in which there was no consideration of the merits—the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense; (6) whether—if the judgment was rendered after a trial on the merits—the movant had a fair opportunity to present his claim or defense; (7) whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.[233]

## B.   *Timeliness of the Rule 60 Motion*

Here, the parties initially dispute whether the instant motion is timely. Estis contends that Plaintiff's arguments "thus far" have sounded in fraud, mistake, or newly discovered evidence, and

---

[229] *Gulf Coast Bldg. & Supply Co. v. Intern. Broth. of Elec. Workers, Local No. 480, AFL-CIO*, 460 F.2d 105, 108 (5th Cir. 1972) (noting that "[w]here either Clauses (b)(1), (2), (3), (4), or (5) provide coverage for the movant's claim, relief may not be obtained pursuant to Clause (b)(6).").

[230] *Steverson v. GlobalSantaFe Corp.*, 508 F.3d 300, 303 (5th Cir. 2007) (quoting *Stipelcovich v. Sand Dollar Marine, Inc.*, 805 F.2d 599, 604–05 (5th Cir. 1986)).

[231] *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981).

[232] *Stipelcovich*, 805 F.2d at 604.

[233] *Seven Elves,* 635 F.2d at 402 (citations omitted).

contends that the motion is time-barred to the extent that it seeks relief on these bases.[234]  According to Estis, these allegations fall within the grounds for relief set forth in Rule 60(b)(3), and are therefore untimely under the one-year time limit established by Rule 60(c)(1).[235] Plaintiff, however, contends that the motion is governed by Rule 60(b)(6), and is therefore timely because it was filed within a "reasonable time."[236]

Federal Rule of Civil Procedure 60(c)(1) provides that "A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." If the motion is governed by Rule 60(b)(1), (2), or (3) as Defendant contends, it would be untimely, because Plaintiff filed the motion on January 22, 2015, which is more than one year after the Court dismissed Shoemaker's claims in the prior action on May 16, 2012.[237] On the other hand, if the motion is governed by Rule 60(b)(6), as Plaintiff contends, then the motion must have been filed "within a reasonable time" after the Court dismissed the prior action. Accordingly, the Court must first determine whether Rule 60(b)(3) or Rule 60(b)(6) governs the instant motion.

### 1. Whether Rule 60(b)(3) or Rule 60(b)(6) Governs the Instant Motion

Estis asserts that the motion was filed pursuant to Rule 60(b)(3) because Plaintiff is attempting to set aside the settlement due to alleged "misconduct or fraud," and due to "mistake as to the terms of the settlement or alleged information about Shoemaker's mental state discovered after

---

[234] Rec. Doc. 54 at 16.

[235] *Id.* at 16–17 (citing *Lyles v. Seacor Marine, Inc.*, 2014 U.S. App. LEXIS 3025 (5th Cir. 2014); *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869 (5th Cir. 1989)).

[236] Rec. Doc. 61 at 5 (citing *Wink v. Rowan Drilling Co.*, 611 F.2d 98, n.3 (5th Cir. 1980)).

[237] *See* No. 11-2562, Rec. Doc. 50.

the judgment." Estis relies on *Lyles v. Seacor Marine* in support of its argument.[238] There, the plaintiff asserted claims for negligence and unseaworthiness, the district court dismissed those claims, and the Fifth Circuit affirmed the dismissal.[239] Nearly ten years later, the plaintiff filed a "Motion for Relief from Judgment Pursuant to FRCVP [sic] 60(b)(3) Insurance Fraud" reasserting the dismissed claims.[240] The district court denied the motion, and the Fifth Circuit affirmed, reasoning that: (1) the motion was untimely; (2) the plaintiff "did not present clear and convincing evidence of fraud, misrepresentation, or misconduct . . . that prevented him from fully and fairly presenting his case;"[241] (3) the plaintiff did not present evidence that the district court had bias against him;  and (4) the plaintiff could not appropriately use a Rule 60(b) motion to reargue matters raised in his complaint or matters that could have been raised on direct appeal.[242]

Estis also cites *Wilson v. Johns-Manville Sales Corp.*, an asbestos products liability case  in which the plaintiffs filed a Rule 60(b) motion seeking relief from a judgment on the basis that "the defendants fraudulently concealed and misrepresented the fact that they knew of the hazards of asbestos as far back as the 1930's."[243] The district court denied the motion, and the Fifth Circuit affirmed, reasoning that the district court properly analyzed the motion pursuant to Rule 60(b)(3), and correctly found the motion untimely.[244]

---

[238] 555 Fed. App'x 411 (5th Cir. 2014).

[239] *Id.* at 411–12.

[240] *Id.* at 412.

[241] *Id.*

[242] *Id.*

[243] 873 F.2d 869, 870–71 (5th Cir. 1989).

[244] *Id.* at 871–73.

Here, the Court finds the cases cited by Estis for the proposition that Plaintiff's motion should be governed by Rule 60(b)(3) distinguishable from the present case. In *Wilson*, the plaintiff's Rule 60(b) motion expressly alleged fraud. In *Lyles*, the plaintiff's Rule 60(b) motion was expressly designated as a Rule 60(b)(3) motion seeking relief on the basis of "insurance fraud." In the instant case, by contrast, Plaintiff does not allege fraud or expressly rely on Rule 60(b)(3). Plaintiff contends that the settlement and dismissal of Shoemaker's case should be set aside because Shoemaker "did not receive adequate compensation for his injuries, the settlement was entered into very hastily while [Shoemaker] was exhibiting erratic behavior, and [Shoemaker] did not have legal counsel at the time of the settlement."[245]

Plaintiff relies on cases where seamen plaintiffs challenged the validity of their settlement agreements, and the Fifth Circuit applied Rule 60(b)(6).[246] In *Stipelcovich v. Sand Dollar Marine, Inc.*, the plaintiff filed suit on August 26, 1982, alleging causes of action under the Jones Act, 46 U.S.C. § 688, and general maritime for the wrongful death of her husband.[247] The various defendants in the case became aligned into two general groups: (1) the "rig interests;" and (2) and the "vessel interests."[248] Prior to the scheduled trial, the plaintiff entered two separate settlement agreements: (1) an agreement with defendants comprising the rig interests to settle their portion of the case for $50,000; and (2) an agreement with the defendants comprising the vessel interests to settle their portion of the case for $150,000.[249] On April 12, 1985, the plaintiff filed a "Motion to Reinstate

---

[245] Rec. Doc. 78 at 13.

[246] *See, Stipelcovich*, 805 F.2d at 604–5; *Wink*, 611 F.2d at 102 n. 3.

[247] 805 F.2d at 602.

[248] *Id.*

[249] *Id.*

Case," asserting that the defendants had not complied with the settlement agreement.[250] The district court denied the motion.[251] On appeal, the Fifth Circuit concluded that the district court did not abuse its discretion in denying relief to the plaintiff pursuant to Rule 60(b)(6), because: (1) the $200,000 she received in consideration for settlement did not "support a finding that [the plaintiff] was ill-informed of her rights and the consequences of agreeing to settle;" and (2) the plaintiff was "acting upon independent advice by counsel, who explained the agreement and release to her."[252] The Fifth Circuit's opinion did not specifically address whether the motion was timely pursuant to Rule 60(b)(6).

In *Wink v. Rowan Drilling*, the seaman plaintiff filed two successive actions against the defendant.[253] In the first action, the parties reached a settlement agreement, which the district court approved, resulting in dismissal.[254] Two years later, the plaintiff filed a Rule 60(b) motion for relief from the judgment in the first action, and also filed a new complaint seeking to recover additional damages.[255] The plaintiff alleged that the employer defendant had misled the court as to the extent of his injuries and his mental competency.[256] The district court denied the Rule 60(b) motion and dismissed the action based on *res judicata*.[257] On appeal, the Fifth Circuit held that the district court

---

[250] *Id.* at 603. The Fifth Circuit opinion does not indicate how much time passed between the dismissal of the case and the filing of the "Motion to Reinstate Case." *Id.*

[251] *Id.*

[252] *Id.* at 606.

[253] 611 F.2d at 100.

[254] *Id.*

[255] *Id.*

[256] *Id.*

[257] *Id.*

erred in requiring the plaintiff, rather than the employer defendant, to bear the burden of proof.[258] The Fifth Circuit also noted that the plaintiff had filed his Rule 60(b)(6) motion within a "reasonable time."[259]

In the instant motion, Plaintiff contends that the settlement and dismissal of Shoemaker's prior case should be set aside because: (1) Shoemaker did not receive adequate compensation for his injuries; (2) the settlement was entered into very hastily while Shoemaker was exhibiting erratic behavior; and (3) Shoemaker was not represented by counsel at the time of the settlement.[260] These arguments are very similar to the arguments advanced—and addressed pursuant to Rule 60(b)(6)—in *Wink* and *Stipelcovich*. Accordingly, the Court finds that Rule 60(b)(6) governs here, and it will consider whether the instant motion was filed "within a reasonable time," as Rule 60(b)(6) requires.

### 2. Whether the Motion Was Filed "Within a Reasonable Time" Pursuant to Rule 60(b)(6)

Plaintiff asserts that the motion was filed within a reasonable time. Estis argues that Plaintiff's motion was not filed "within a reasonable time," as she has offered "absolutely no justification" for filing the present motion nearly three years after the prior action was dismissed. Estis notes that Plaintiff was present with Shoemaker during the negotiation, settlement, and related judicial proceedings in the prior action, and would have been aware of any impairment affecting Shoemaker at that time.

---

[258] *Id.* at 101.

[259] *Id.* at n.3.

[260] Rec. Doc. 78 at 13.

The Fifth Circuit instructs that "[a] district court is provided wide discretion in determining whether a Rule 60(b) motion is filed within a reasonable time."[261] In this inquiry, the "particular facts of the case in question" determine whether a motion has been timely filed.[262] Further, in determining whether a motion has been filed within a reasonable time, the Fifth Circuit instructs that district courts should consider: (1) "the interest in finality;" (2) "the reason for delay;" (3) "the practical ability of the litigant to learn earlier of the grounds relied upon;" and (4) "prejudice to other parties."[263]

The Fifth Circuit has affirmed denials of Rule 60 motions based upon timeliness grounds.[264] In *First RepublicBank Fort Worth v. Norglass, Inc.,* a matter proceeded to trial and final judgment in state court.[265] Following the judgment in state court, two parties filed pleas of intervention, alleging that they had been appointed receiver of the plaintiff, and petitions for removal of the case to federal court.[266] Following removal of the case to federal court, the defendant filed a motion to dismiss and a motion to remand, both of which were denied by the federal district court.[267] Two years later, the intervening parties filed a Rule 60 motion seeking relief from the state court judgment, in which they asserted defenses that had not been previously raised in the litigation.[268] The district court denied the

---

[261] *McKay v. Novartis Pharmaceutical Corp.*, 751 F.3d 694, 701 n. 5 (5th Cir. 2014) (citations omitted).

[262] *Id.* (citations omitted).

[263] *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994) (internal citations and quotation marks omitted).

[264] *See Travelers Inc. Co.*, 38 F.3d at 1411; *First RepublicBank Fort Worth v. Norglass, Inc.*, 958 F.2d 117 (1992).

[265] 958 F.2d at 118.

[266] *Id.*

[267] *Id.*

[268] *Id.* at 118–19.

motion,[269] and the Fifth Circuit affirmed, reasoning that the moving parties offered "no excuse for their twenty-four month delay other than to suggest that the motion required extensive research," and concluding that the district court did not abuse its discretion in finding that the delay was "beyond the bounds of reasonableness" in the absence of a "valid justification."[270]

Conversely, in *Wink v. Rowan Drilling*, discussed above, the Fifth Circuit found that a Rule 60(b)(6) motion was filed within a "reasonable time" where the seaman plaintiff filed the motion two years after settling his case.[271] There, the Fifth Circuit did not point to any facts in support of its finding that the motion was filed within a "reasonable time."[272]

Here, the Court dismissed the prior case on May 16, 2012. Plaintiff filed the instant case on January 21, 2014,[273] 20 months after the dismissal of the prior case, and she filed the Rule 60 motion on January 22, 2015, 32 months after the dismissal of the prior case.[274] As noted above, in determining whether a motion has been filed within a reasonable time, the Court must consider: (1) "the interest in finality;" (2) "the reason for delay;" (3) "the practical ability of the litigant to learn earlier of the grounds relied upon;" and (4) "prejudice to other parties."[275] Turning first to the reason for the delay, the Court finds that the evidence adduced at the evidentiary hearing does not provide any compelling reason why Plaintiff delayed in filing the Rule 60 motion.

---

[269] *Id.* at 119.

[270] *Id.* at 121–22.

[271] 611 F.2d at n.3.

[272] *Id.*

[273] Rec. Doc. 1.

[274] Rec. Doc. 51.

[275] *Travelers Ins. Co.*, 38 F.3d at 1410.

Plaintiff's testimony indicates that she was aware of Shoemaker's mental condition prior to the settlement and dismissal of the prior case. She testified that following his release from the hospital in 2011, Shoemaker would get upset and act "out of control."[276] Plaintiff also testified that Shoemaker could not take care of himself following his September 2011 accident, but she did not have him interdicted at that time because "tough love is hard."[277] According to Plaintiff, Steele was trying to get Shoemaker mental health treatment prior to the settlement.[278]

Plaintiff was present when Shoemaker negotiated the settlement agreement with Hoyle,[279] attended the settlement conference with Magistrate Judge Knowles,[280] and attended the signing of the Receipt and Release.[281] Even though Plaintiff was present during all of these events, she never raised any objection to the settlement. She testified that she understood that Shoemaker was settling his case.[282] She stated that she did not speak up at the settlement conference because she had "to live with [her] son."[283] At the evidentiary hearing, Plaintiff opined that Shoemaker was incapable of answering the questions posed to him at that time because of the pain medication he was taking.[284] However,

---

[276] Transcript at 25.

[277] *Id.* at 73.

[278] *Id.* at 78.

[279] *Id.* at 77, 87–88.

[280] *Id.* at 52.

[281] *Id.* at 55–56.

[282] *Id.* at 53.

[283] *Id.* at 53, 82.

[284] *Id.* at 93.

during the signing of the Receipt and Release, Plaintiff testified that she believed Shoemaker understood the proceedings.[285]

Hoyle's testimony also supports a finding that Plaintiff was actively involved in the settlement of the prior case. According to Hoyle, Plaintiff called him at some point in January 2012, and left a message indicating that Shoemaker was interested in settling his case.[286] Hoyle testified that on February 16, 2012, he went to Shoemaker's home to discuss settlement.[287] Plaintiff was present during these negotiations, and Hoyle stated that "[e]veryone in the room was highly motivated to resolve this claim including Mr. Shoemaker."[288] Moreover, Steele, Shoemaker's former attorney, testified that Plaintiff and Shoemaker were a "united front" on the issue of settling the case.[289]

Notwithstanding the evidence of Plaintiff's participation in the settlement negotiations and proceedings, Plaintiff testified that she believed Shoemaker was taken advantage of in settling his case "from the get-go."[290] According to Plaintiff, immediately following the settlement, she felt that it never should have occurred.[291] However, Plaintiff did not file the instant case until 20 months after the dismissal of the prior case, and she waited an additional year to file this Rule 60 motion. Addressing her failure to express this apprehension during the settlement negotiations and

---

[285] *Id.* at 91.

[286] *Id.* at 172.

[287] *Id.* at 175, 177.

[288] *Id.* at 179.

[289] *Id.* at 223.

[290] *Id.* at 108.

[291] *Id.*

proceedings, Plaintiff indicated that she feared provoking Shoemaker, who was motivated to settle and was behaving in a volatile manner.[292]

Even if Plaintiff harbored doubts about the settlement at the time it was finalized, and even if she feared the consequences of expressing these doubts at that time, her testimony indicates that she was extensively involved in Shoemaker's life and affairs after the settlement, and took numerous actions on his behalf during the period between the first lawsuit and the present one. Specifically, Plaintiff testified that she: (1) contacted Ronna Steele, Shoemaker's former attorney, to request that she take the case again;[293] (2) was involved in Shoemaker's admission to an inpatient treatment program;[294] (3) sought, and obtained, his interdiction in state court;[295] (4) pursued Social Security Disability benefits on his behalf;[296] and (5) involved law enforcement when necessary to keep Shoemaker's behavior under control.[297]

Plaintiff's testimony regarding her involvement in these activities—and especially her testimony that she contacted Ms. Steele and requested her assistance in seeking to reopen the case—indicates that any apprehension she may have initially felt about acting on Shoemaker's behalf and about expressing her misgivings about the settlement abated at some point prior to the instant litigation. Nonetheless, Plaintiff adduced no evidence indicating that she took any further action to attack the validity of the settlement until filing the instant case nearly two years after settlement was

---

[292] *Id.* at 53–54, 82.

[293] *Id.* at 111–12.

[294] *Id.* at 60.

[295] Rec. Doc. 11-1.

[296] Transcript at 74.

[297] *Id.* at 59–60.

completed. Further, Plaintiff has provided no evidence explaining her failure to do so. Accordingly, the Court finds that the reasons for delay are not particularly compelling in the instant case.

Turning to the remaining factors the Court must consider in determining whether the motion was filed within a reasonable time—the interest in finality, the prejudice to other parties, and the practical ability of the litigant to learn earlier of the grounds relied upon—the Court finds that these factors weigh in favor of denying the motion. The Fifth Circuit has observed that "the desirability of finality in judgments" categorically weighs against granting Rule 60(b) motions, particularly when "reopening . . . a judgment could unfairly prejudice the opposing party."[298] Here, the interest in finality clearly weighs against reopening Shoemaker's case, which was dismissed nearly two years before Plaintiff filed the instant case, and nearly three years before Plaintiff filed the instant motion. Additionally, as to "the practical ability of [Plaintiff] to learn earlier of the grounds relied upon," Plaintiff herself indicated that she harbored doubts about the settlement from the "get go," and even contacted Ronna Steele to request her assistance in voiding it, but then took no further action until the present time. Thus, according to Plaintiff's own testimony, she was aware of the basis for the instant motion at the time the prior action was settled and dismissed.

Based upon the foregoing, the Court finds, even when construing the rule liberally, that the timing of the instant motion exceeds the bounds of reasonableness, warranting its denial on timeliness grounds alone. However, as discussed above, in *Wink v. Rowan Drilling*, the Fifth Circuit found that a Rule 60(b)(6) motion was filed within a "reasonable time" where the seaman plaintiff filed the motion two years after settling his case.[299] Because  Plaintiff filed the instant case two years after the settlement of the prior case and because seamen are wards of the Court and any release or settlement

---

[298] *Fackleman v. Bell*, 564 F.2d 734, 736 (5th Cir. 1977).

[299] 611 F.2d at n.3.

involving their rights is subject to careful scrutiny,"[300] the Court will consider whether the Receipt and Release entered into by Shoemaker was valid.

## C.    *Validity of the Receipt and Release*

Plaintiff asserts that this Court should set aside the settlement and vacate the judgment of dismissal in the prior litigation because: (1) Shoemaker did not have the mental capacity to understand the release due to his injuries and use of narcotic pain medications; (2) Shoemaker negotiated the settlement agreement without legal counsel and was not fully aware of his legal rights at the time he signed the release; and (3) Shoemaker received a "woefully inadequate" sum from Estis.[301] Defendant counters that it has met its burden of proving that Shoemaker understood the nature and effect of the settlement by pointing to "transcripts of the settlement conference and sworn statements made contemporaneously with the settlement on March 8, 2012."[302]

"Seamen are wards of admiralty and any release or settlement involving their rights is subject to careful scrutiny."[303] The shipowner bears the burden of proving that a seaman's release is valid, and "[t]he ultimate concern . . . [is] whether the seaman relinquished his rights with an informed understanding of his rights and a full appreciation of the consequences when he executed a release."[304] "Factors relevant to an appraisal of a seaman's understanding of his rights include the nature of the legal advice available to the seaman at the time of signing the release, the adequacy of the consideration, whether the parties negotiated at arm's length and in good faith, and whether there

---

[300] *Stipelcovich*, 805 F.2d at 606 (citing *Wink*, 611 F.2d at 100).

[301] Rec. Doc. 51 at 2; Rec. Doc. 61 at 5.

[302] Rec. Doc. 54 at 23.

[303] *Stipelcovich*, 805 F.2d at 606 (citing *Wink*, 611 F.2d at 100).

[304] *Steverson*, 508 F.3d at 304 (citing *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942)).

was the appearance of fraud or coercion."[305] Mental capacity is also a factor in the analysis.[306] After conducting an evidentiary hearing and considering these factors, if the Court finds that the seaman plaintiff was well-informed of his rights and the consequences of the settlement agreement, it is appropriate to deny a Rule 60(b) motion and decline to reinstate the original lawsuit.[307]

### 1.    Mental Capacity

Plaintiff asserts that "due to his head injury, reliance on narcotic pain medication, and his injuries, Shoemaker did not understand the Release which he entered into."[308] Estis contends that at the time Shoemaker settled his prior case, he was competent and fully understood the nature of the settlement agreement.[309]

In *Borne v. A&P Boat Rentals No. 4, Inc.*, after reaching a settlement the plaintiff refused to consummate it, and the defendant moved to enforce the settlement.[310] The district court entered judgment for the plaintiff in the amount of the settlement, and the plaintiff appealed, contending that he lacked the requisite mental capacity to enter into the agreement.[311] The Fifth Circuit rejected this argument, noting that: (1) "there is no evidence" that the plaintiff was mentally incapacitated or had been adjudicated incompetent; (2) "the court was never asked to appoint a guardian" for the plaintiff; (3) the plaintiff "had held a job for nine years," (4) was able to write his name, (5) "knew when to

---

[305] *Simpson v. Lykes Bros. Inc.*, 22 F.3d 601, 602 (5th Cir. 1994) (citing *Borne v. A&P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256–57 (5th Cir. 1986)).

[306] *Borne*, 780 F.2d at 1257.

[307] *See, e.g., Stipelcovich*, 805 F.2d at 606–07.

[308] Rec. Doc. 51 at 2.

[309] Rec. Doc. 54 at 20.

[310] 780 F.2d at 1255.

[311] *Id.* at 1255, 1257.

seek help from others," and (6) "had been able to discharge his first attorney and retain new counsel eleven months after initiating the action."[312] Therefore, the Court concluded that mental capacity was not a controlling factor in determining the validity of the settlement.[313] Considering that the plaintiff was represented by counsel, the settlement was reached after full investigation into the case, and safeguards were in place to protect the plaintiff, the Fifth Circuit found that the district court did not err in enforcing the settlement.[314]

Plaintiff relies on *Halliburton v. Ocean Drilling & Exploration Co.*[315] There, the district court granted summary judgment in favor of the defendant, finding that there was no genuine issue of material fact as to the validity of the release executed by the plaintiff.[316] In opposition to the motion, the plaintiff had filed an affidavit of a pharmacologist, which stated that the medications the plaintiff was taking at the time of the settlement effected his "mental faculties."[317] On appeal, the Fifth Circuit found that the district court erred in granting summary judgment because the "plaintiff's submission created genuine issues of material fact."[318] This case is distinguishable from *Halliburton* because, here, this Court is not considering a motion for summary judgment, where there may be a dispute as to whether a release was validly executed, preventing judgment at that stage of the litigation before live testimony can be heard. Here, the Court denied summary judgment in an earlier order because

---

[312] *Id.* at 1257.

[313] *Id.*

[314] *Id.* at 1258.

[315] 620 F.2d 444 (5th Cir. 1980)).

[316] *Id.* at 445.

[317] *Id.*

[318] *Id.*

44

there was a dispute as to the validity of the prior release,[319] and now, after a hearing on Plaintiff's Rule 60 motion, where live testimony was heard and evidence was presented, the Court is actually deciding the single issue regarding the validity of the prior release. Therefore, *Halliburton* is not applicable here for the purpose Plaintiff advances.

Plaintiff testified that Shoemaker behaved erratically in the period leading up to his settlement, and was prone to violent outbursts that she could not control.[320] Plaintiff also testified that Shoemaker terminated his attorney, Ronna Steele, shortly before commencing direct settlement negotiations with Estis,[321] and was taking prescription medication that diminished his mental capacity at that time.[322] Plaintiff introduced into evidence records from two pharmacies listing certain medications prescribed to Shoemaker after his injury.[323]

Plaintiff also introduced records of Shoemaker's post-injury medical treatment.[324] Those records indicate that on October 28, 2011, Dr. Bradley Bartholomew, a neurological surgeon, ordered an MRI of Shoemaker's brain because he was concerned that Shoemaker complained of memory problems.[325] Dr. Bartholomew opined that Shoemaker appeared to have "a concussive-type syndrome."[326] On January 5, 2012, Dr. Bartholomew reviewed the MRI of Shoemaker's brain, finding

---

[319] Rec. Doc. 42.

[320] Transcript at 26, 34.

[321] *Id.* at 41–42, 77.

[322] *Id.* at 93.

[323] P's Ex. 2; P's Ex. 4.

[324] P's Ex. 3.

[325] *Id.* at p. 3 of October 28, 2011 Clinic Note.

[326] *Id.*

"no intracranial pathology."[327] Dr. Bartholomew recommended that Shoemaker undergo neuropsychological testing.[328] Dr. Bartholomew also noted that Shoemaker became upset when he declined to prescribe him any narcotics, which could interfere with brain function.[329]

Plaintiff introduced a letter from Steele to Magistrate Judge Shushan, dated February 17, 2012, the day after Mr. Shoemaker fired Steele, in which Steele raises concerns about Mr. Shoemaker's behavior.[330] Magistrate Judge Knowles, who was deposed by the parties on April 13, 2014, considered these records and stated that the information would "give [him] pause and would cause [him] to question [Shoemaker] a lot more carefully than [he] would a normal personal injury plaintiff."[331]

Plaintiff also adduced testimony and a report from Dr. Roberta Bell, who examined Shoemaker on September 3, 2013, over a year after the settlement.[332] The Court accepted Dr. Bell as an expert in clinical psychology and neuropsychology.[333] Dr. Bell's report states that "[t]he purpose of the present evaluation is to document Shoemaker's *current* neuropsychological status."[334] The report also states that Shoemaker "is judged to have a significant cognitive and emotional disability,

---

[327] *Id.* at p. 1 of January 5, 2012 Office Note.

[328] *Id.*

[329] *Id.*

[330] P's Ex. 1-a.

[331] D's Ex. 14 at 6–7.

[332] P's Ex. 5.

[333] *See* FED. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.").

[334] P's Ex. 5 at 5 (emphasis added).

46

consistent with expectations based upon his history of a head injury on [September 28, 2011]."[335]
Estis objected to Dr. Bell testifying about Shoemaker's condition at the time of the settlement.[336] Over
Estis's objection, Dr. Bell opined that she would expect a brain injury "to improve initially at a rapid
pace and then plateau."[337] She testified that she would not expect Shoemaker's mental condition to
continue to deteriorate following the settlement and her evaluation of him.[338]

   The Court admitted Bell's testimony regarding Shoemaker's mental capacity at the time of
settlement. However, the Court accords little weight to the testimony.[339] Dr. Bell's report does not
assess Shoemaker's mental capacity at the time he settled his case. No evidence indicates that Dr.
Bell had any involvement with Shoemaker's treatment until she evaluated him in September 2013,
over one year after Shoemaker settled his case. Further, Dr. Bell testified that she did not have any
prior test results to compare with the results she obtained during her evaluation of Shoemaker.[340] Dr.
Bell also stated that  Shoemaker reported a suicide attempt by motor vehicle in the year following
the settlement of his case.[341] Dr. Bell did not know if Shoemaker sustained a head injury during the

---

[335] *Id.* at 10.

[336] At the hearing, Estis asserted that testimony from Bell regarding Shoemaker's condition at the time of settlement would exceed the scope of her expert report. *See* FED. R. CIV. P. 26(a) ("Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them . . .").

[337] Transcript at 138.

[338] *Id.*

[339] *See Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012) ("The basis of an expert's opinion usually goes to the weight, not the admissibility of the testimony.").

[340] Transcript at 124, 128.

[341] *Id.* at 118, 147.

suicide attempt, but she opined that it was "very possible" that he could have sustained a head injury, which could explain a decline in his cognitive skills prior to her evaluation of him.[342] Finally, although  Dr. Bell's report notes that Shoemaker's treating physicians observed that he exhibited "poor short-term memory and loss of concentration" and had "at least a concussive type syndrome"[343] following the accident, several portions of the report addressing Shoemaker's condition after the accident appear to derive from subjective information provided by Plaintiff and Shoemaker without the benefit of outside corroboration.[344] Thus, Bell's opinions regarding Shoemaker's mental capacity at the time of the settlement, over one year before she actually examined him, are of limited use to the Court in its current inquiry.

Also over Estis's objection,[345] Dr. Bell testified regarding the effects of various medications that Plaintiff claims Shoemaker was taking at the time he settled his case.[346] The Court allowed Dr. Bell to testify regarding medications allegedly taken by Shoemaker, but informed the parties that it might strike the testimony pending further briefing from the parties. After the hearing, neither party briefed this specific issue, despite being given the opportunity to do so. Regardless, it is undisputed that Dr. Bell did not observe Shoemaker until long after Shoemaker settled his case. Moreover,

---

[342] *Id.* at 147.

[343] P's Ex. 5 at 4.

[344] *See Id.* at 1–3 ("This patient states that, since the . . . explosion, he has experienced problems with reasoning, expressive and receptive language, motor coordination, speech, concentration, and memory . . . since the injury, he reports that he has experienced feelings of frustration, indecisiveness, irritability, anxiety, depression, hallucinations, and delusions . . . In order to obtain additional information regarding Shoemaker's status before versus after his injury, his mother . . . was asked to produce a brief narrative and complete a checklist. Ms. Shoemaker indicates that her son's behavior has changed since the injury . . . In addition, she find that her son experiences problems with concentration, confusion, and understanding conversation, expressive language, motor coordination, reasoning, and at times, speech.").

[345] On this point, Estis objected that Bell's report did not address medication prescribed to Shoemaker.

[346] Transcript at 133-45.

Plaintiff's counsel provided Dr. Bell with the list of medications that Shoemaker was allegedly taking at the time of the settlement,[347] but Plaintiff presented no corroborating evidence to show that Shoemaker had actually taken any of those medications on the day he entered into the settlement agreement. Consequently, her testimony regarding the possible effects of certain medication allegedly prescribed to, and taken by, Shoemaker is worth little weight.

Testimony from individuals who actually observed Shoemaker at the time he settled his case demonstrates that Shoemaker was competent to settle his case. Jack Hoyle, a claims adjuster hired by Estis, testified that he never observed Shoemaker acting in a way that would cause him to question his competence.[348] Harry Morse, an attorney hired by Estis to explain the Receipt and Release to Shoemaker, testified that Shoemaker did not hesitate in responses to questions or exhibit any unusual behavior during the conference.[349] According to Morse, Shoemaker represented that he had not consumed alcohol or taken any medication that would affect his judgment in the 24 hours preceding the conference.[350] During the conference, Plaintiff also represented that she believed Shoemaker understood the release.[351]

Further, Estis introduced into evidence a transcript of the settlement conference before Magistrate Judge Knowles in which Magistrate Judge Knowles questioned Shoemaker about the settlement, his understanding of its terms, and whether he had the opportunity to discuss it with

---

[347] Transcript at 133.

[348] *Id.* at 185.

[349] *Id.* at 200.

[350] *Id.* at 202.

[351] *Id.* at 203–04.

49

Plaintiff, who was present during those proceedings.[352] Shoemaker answered these inquiries in the affirmative.[353]

Estis also introduced into evidence a transcript of the conference where Morse placed the Receipt and Release on the record. During the colloquy, Morse twice questioned Shoemaker regarding whether he had taken any drugs, medication, or alcohol that would have affected his judgment, and whether he understood the colloquy.[354] Both times, Shoemaker denied having taken any such substances, and confirmed that he understood the colloquy.[355] During the colloquy, Plaintiff also told Morse that she believed Shoemaker understood the colloquy and was of sound mind.[356]

At the hearing on the instant motion, Shoemaker testified that he responded in this way because Hoyle, Estis's claims adjuster, coached him to do so.[357] Plaintiff also testified that Hoyle instructed Shoemaker not to tell the Magistrate Judge that he was taking medication.[358] The Court finds Plaintiff and Shoemaker's testimony self-serving. Shoemaker could not recall any other details about the settlement conference. Further, both Plaintiff and Shoemaker's testimony at the evidentiary hearing directly conflicts with the statements they made to Magistrate Judge Knowles and to Morse regarding Shoemaker's ability to understand the proceedings. Moreover, the Court had the opportunity to observe both Plaintiff and Shoemaker during their testimony. Further, Hoyle denied

---

[352] D's Ex. 6.

[353] *Id.*

[354] D's Ex. 5 at 5–6; 40–41.

[355] *Id.*

[356] *Id.* at 6.

[357] Transcript at 153.

[358] *Id.* at 48, 90.

telling Shoemaker not to report his medication use to Magistrate Judge Knowles,[359] and the Court finds Hoyle's testimony credible. Taking all of this into consideration, the Court gives Plaintiff and Shoemaker's testimony on this issue little weight.[360]

Plaintiff relies on the letter Steele sent to Magistrate Judge Shushan on February 17, 2012, raising concerns about Shoemaker's behavior.[361] The letter urges Magistrate Judge Shushan to "carefully scrutinize" the proposed settlement agreement because Shoemaker had "exhibited behavior which calls into question both his understanding and capacity."[362] At the evidentiary hearing, Steele testified that she sent a letter to Magistrate Judge Shushan regarding Shoemaker's case because she believed that Shoemaker "may have settled his case for less than it was worth."[363] Steele testified that she was referencing the fact that Shoemaker is not well educated and was choosing to settle his case without representation.[364] However, she also testified that she did not believe there was anything more the Court or she could do to prevent Shoemaker from entering the settlement agreement.[365]

Based upon the foregoing, the Court finds that Estis has presented sufficient evidence to show that Shoemaker had the mental capacity to understand the settlement at the time he settled his case.

---

[359] *Id.* at 181.

[360] Estis argues that Plaintiff is "attempting to perpetrate a fraud," because she repeatedly certified that Shoemaker was not impaired at the time the settlement was completed, and now "asserts that all of the certifications were false," in order to "get more money than what she agreed was a valid settlement three years ago." Rec. Doc. 54 at 23–24. This assertion goes to the credibility of Plaintiff's testimony. Here, the Court gives Plaintiff's testimony little weight.

[361] P's Ex. 1-a. Magistrate Judge Shushan was originally assigned to the case. Magistrate Judge Knowles conducted the settlement conference because Magistrate Judge Shushan was not available.

[362] *Id.*

[363] Transcript at 226, 228.

[364] *Id.*

[365] *Id.* at 244.

Plaintiff relies on her testimony that Shoemaker behaved erratically in the period leading up to his settlement, and her testimony that Shoemaker was taking prescription medication that diminished his mental capacity at that time. She also relies on pharmacy records and records of Shoemaker's post-injury medical treatment, which show that Dr. Bartholomew believed Shoemaker had "a concussive-type syndrome." Finally, Plaintiff relies on the testimony and report of Dr. Bell, which the Court accords little weight because Dr. Bell did not assess Shoemaker's mental capacity at the time he settled his case and relied on uncorroborated information when assessing his current mental state. Estis relies on the testimony of Morse and Hoyle, individuals who actually observed Shoemaker at the time he settled his case, and testified that Shoemaker did not act in a way that caused them to question his competency. Further, Estis presented transcripts of the settlement conference before Magistrate Judge Knowles and the signing of the Receipt and Release, wherein Plaintiff directly contradicted the testimony she gave at the evidentiary hearing regarding Shoemaker's mental capacity. Finally, Steele testified that Plaintiff and Shoemaker both wanted to settle the case, and she did not believe there was anything else the Court could have done to prevent Shoemaker from entering the settlement. Moreover, the Court was in the unique position of actually hearing the testimony live and able to observe and listen to the testimony firsthand. Accordingly, the Court finds that the weight of the evidence shows that Shoemaker had the mental capacity to understand the settlement at the time he entered into the Receipt and Release.

### 2.     Advice and Negotiations

Plaintiff also argues that Shoemaker negotiated his release without counsel, and did not possess full knowledge of his legal rights at the time he perfected the release.[366] Defendant counters

---

[366] Rec. Doc. 61 at 5.

that it has met its burden of proving Shoemaker's understanding of the nature and effect of the settlement by pointing to "transcripts of the settlement conference and sworn statements made contemporaneously with the settlement on March 8, 2012."[367]

As a general matter, "[w]hen a seaman is acting upon independent advice and that advice is disinterested and based on a reasonable investigation, there being no question of competence, a settlement agreement will not be set aside."[368] On the other hand, where the seaman is not represented by counsel, and evidence shows that the seaman did not fully appreciate his rights and the consequences of settlement, it is appropriate to vacate the settlement.[369] In *Gueho v. Diamond M. Drilling Co.*, the plaintiff entered into a settlement agreement without counsel, and later moved to vacate the settlement.[370] In support of this motion, the plaintiff adduced evidence demonstrating that he was "led to believe that he would maintain his employment" after settlement.[371] In light of this evidence, the district court vacated the settlement.[372] The Fifth Circuit affirmed, holding that "the defendant did not bear its burden of demonstrating that the seaman fully appreciated the consequences of the settlement."[373]

Nonetheless, the Fifth Circuit instructs that courts may "uphold a release even when the seaman is not represented by his attorney."[374] For example, in *Charpentier v. Fluor Ocean Services,*

---

[367] Rec. Doc. 54 at 23.

[368] *Borne,* 780 F.2d at 1258.

[369] *Gueho v. Diamond M. Drilling Co.*, 524 F.2d 986, 987 (5th Cir. 1975).

[370] *Id.*

[371] *Id.*

[372] *Id.*

[373] *Id.*

[374] *Castillo v. Spiliada Maritime Corp.*, 937 F.2d 240, 246 n. 7 (5th Cir. 1991).

*Inc.*, an unrepresented seaman signed a release, and subsequently filed a lawsuit seeking to recover for his injuries.[375] The district court ultimately tried the issue of the validity of the release, and found the release to be valid.[376] The Fifth Circuit affirmed, concluding that although the plaintiff was unrepresented at the time of settlement,

> [T]he insurance company's attorney[] advised [the plaintiff and his wife] of his rights as a seaman . . . distinguished the Louisiana Workmen's Compensation Act, the Longshoremen's and Harbor Workers' Compensation Act and the Jones Act for the plaintiff and detailed his rights under each Act . . . [and] also discussed thoroughly comparative negligence, unseaworthiness, maintenance and cure, the various elements of damages, and the right to counsel with the plaintiff and his wife. Finally, [the attorney] ascertained that plaintiff understood the release and the binding effect it would have on any claim plaintiff might want to bring.[377]

Based on these facts, the Fifth Circuit found that "the record does not establish that the trial court was clearly erroneous in concluding that plaintiff was informed of his legal rights."[378]

Here, it is undisputed that Shoemaker terminated his attorney before agreeing to settle his case. However, like in *Charpentier*, Estis retained Harry Morse, an attorney, to advise Shoemaker of his rights as a seaman. Estis has presented a transcript of the conference where Morse explained the Receipt and Release to Shoemaker.[379] During that conference, Morse informed Shoemaker that he had the right to retain independent counsel.[380] Morse also advised Shoemaker that settlement would preclude him from bringing any other claims in connection with the underlying accident, and

---

[375] 613 F.2d 81, 83 (5th Cir. 1980).

[376] *Id.* at 83–84.

[377] *Id.* at 84.

[378] *Id.*

[379] D's Ex 5.

[380] *Id.* at 8, 37.

that he would be precluded from seeking any other medical treatment.[381] Morse explained the law to Shoemaker, advising him of his rights as a Jones Act seaman.[382] Morse also advised Shoemaker that future employment with Estis was not guaranteed.[383]

Unlike in *Gueho*, nothing in the record indicates that Estis or its representatives made false representations to Shoemaker in return for his agreement to settle his case. Accordingly, here, as in *Charpentier*, the Court finds that Estis has met its burden of showing that, although Shoemaker was unrepresented at the time of the settlement, he was fully advised of and appreciated his rights and the consequences of the settlement.

### 3.        Adequacy of Consideration

Finally, Plaintiff contends that the consideration Shoemaker received for settlement was "woefully inadequate to compensate him for the damages he sustained which are serious, debilitating, life threatening and permanent."[384] Estis counters that "[d]uring the almost three years since the settlement was perfected, the Shoemakers had no objection to negotiating and spending the Estis' settlement payment of $115,000.00."[385] According to Estis, Plaintiff is merely "seeking more money by exploiting false testimony" in the present case.[386]

The Fifth Circuit instructs that "adequacy of the settlement consideration" is relevant "only insofar as it indicates 'whether the seaman had a full understanding of his rights and of the

---

[381] *Id.* at 17–20.

[382] *Id.* at 20–25.

[383] *Id.* at 36.

[384] Rec. Doc. 51 at 2.

[385] Rec. Doc. 54 at 20.

[386] *Id.*

consequences of the settlement agreement.'"[387] The parties do not point to any case in which the Fifth Circuit addressed how adequacy of consideration should be measured, and the Court has not found any Fifth Circuit authority addressing the point. However, district courts have set aside settlement agreements based in part on findings that seamen received inadequate consideration for the settlement. These courts have analyzed the amount of consideration in light of the circumstances surrounding the settlement and the gravity of the plaintiff's injuries.[388] This approach appears to be consistent with the Fifth Circuit's instruction that adequacy of consideration is relevant to the extent that it indicates a seaman's understanding of his rights and the consequences of the settlement agreement.[389]

On this point, Jack Hoyle testified that the parties reached an agreement through negotiation, during which all present—including Plaintiff and Shoemaker—were motivated to settle.[390] Ronna Steele testified that on the date Shoemaker fired her and began negotiating directly with Estis,

---

[387] *Borne*, 780 F.2d at 1257 (quoting *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1161 (5th Cir. 1985)).

[388] *See, e.g. Durley v. Offshore Drilling Co.*, No. 06-5681, 2009 WL 799977 at *3 (E.D. La. Mar. 29, 2009) (Barbier, J.) (noting that "the settlement amount of $3,000 is not adequate compensation considering Durley's serious knee and back injuries," and concluding that the release was invalid because the plaintiff (1) received no legal advice in accepting the settlement; (2) the settlement was not "based on any negotiations" with the defendant; and (3) the plaintiff "consistently expressed" that he needed money and needed to get back to work."); *Morris v. Fidelity & Cas. Co. of New York*, 321 F.Supp.320 (E.D. La. 1970) (holding that $350 worker's compensation settlement was "woefully inadequate" in light of the plaintiff's "severe[ly] fracture[d]" jaw, "loss of four teeth," and "loss of about seven weeks' wages at $180 per week."). *See also Double J Marine, LLC v. Nuber*, No. 13-5825, 2013 WL 6502866 at *3 (E.D. La. Dec. 11, 2013) (Feldman, J.) (finding a genuine issue of material fact regarding the validity of a settlement agreement in light of evidence that (1) the plaintiff swore that he did not fully understand the consequences of settlement; (2) the plaintiff received only $350 in consideration; (3) the plaintiff's physician subsequently recommended that the plaintiff undergo surgery for herniated discs; and (4) the plaintiff, uncounseled, signed the release at a gas station on the same day he was initially treated for his injury; and (5) the plaintiff had a 10th grade education.").

[389] *Borne*, 780 F.2d at 1257.

[390] Transcript at 179.

Shoemaker refused to be deposed.[391] Steele testified that she was concerned that Shoemaker might settle his case for less than it was worth, and communicated her concern to Shoemaker and Plaintiff.[392] However, Steele testified that both Shoemaker and Plaintiff appeared highly motivated to settle.[393] Further, it is undisputed that in the settlement proceedings before Magistrate Judge Knowles, neither Plaintiff nor Shoemaker expressed any reservation about settlement terms or about Shoemaker's ability to understand them.  Finally, as noted above, a transcript of the colloquy with Harry Morse indicates that Morse thoroughly discussed the terms of the settlement with Shoemaker before Shoemaker executed the release, and also questioned Plaintiff regarding whether Shoemaker understood the colloquy.[394]

Therefore, the Court finds that this evidence shows that Shoemaker was competent when he settled his claims. Moreover, he received sufficient information about the terms of the settlement and its consequences, and had several opportunities to express any doubts he may have had about it. The evidence also shows that Plaintiff was intimately involved in the settlement process and made no attempt to interrupt that process on Shoemaker's behalf, if indeed she believed that Shoemaker did not understand what he was doing or that the amount of consideration offered to Shoemaker was inadequate. Accordingly, the Court finds that the settlement was adequate because Estis has demonstrated that Shoemaker had a full understanding of his rights and of the consequences of the settlement agreement.

---

[391] *Id.* at 223–26.

[392] *Id.* at 226, 228.

[393] *Id.* at 223.

[394] D's Ex. 5.

4.        **Conclusion: Validity of the Settlement**

Based upon the evidence presented, the Court finds that Estis has carried its burden of proving the validity of the settlement. First, Estis has presented sufficient evidence that Shoemaker was capable of understanding the release at the time he entered into it. Second, although Shoemaker was not represented at the time he settled his claims, Estis has shown that Shoemaker was carefully questioned before he signed his release, and the record is devoid of any credible evidence of overreaching on Estis's part. Rather, it appears that Shoemaker and Plaintiff aggressively pursued settlement, and Estis, in turn, acted appropriately in responding to their inquiries. Finally, in the circumstances present here, the consideration given to Shoemaker does not suggest that Shoemaker lacked a "full understanding of his rights and of the consequences of the settlement agreement."[395] Rather, the testimony given at the hearing by all of the witnesses indicates that Shoemaker was motivated to settle his claims. Furthermore, Morse's testimony, and the settlement transcripts adduced by Estis, show that Plaintiff and Shoemaker were informed of Shoemaker's rights before finalizing the settlement agreement.

The Court notes that Plaintiff and Shoemaker acted in unity when deciding to settle Shoemaker's claims, and rather than take the advice of counsel, Ronna Steele, fired her and pursued negotiations with Estis without an attorney to maximize what they would ultimately receive. It appears in hindsight, they believe that they should have taken their lawyer's advice and not settle at that time. However, they presented no evidence indicating that they did not understand the consequences of their decision to settle Shoemaker's claims at the time. The fact that now they think that Shoemaker could have received more money does not mean that the recovery he did in fact

---

[395] *Borne,* 780 F.2d at 1257.

receive was somehow inadequate or negotiated in bad faith. Thus, assuming that Plaintiff's motion

was filed within a reasonable time pursuant to Rule 60(b)(6), the Court finds that Estis has carried

its burden of proving the validity of the settlement and therefore the Court will deny a Rule 60(b)

motion and decline to reinstate the original lawsuit.

### IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Shoemaker's "Motion Under Rule 60 for Relief from an Order of

Dismissal and to Set Aside a Compromise"[396] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this  12th  day of August, 2015.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[396] Rec. Doc. 51.

59